# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **PATSY WEATHERLY,** | § | |
| **EDITH WICHMAN, MICHELLE** | § | |
| **MORRISON, FELIX BRAVO,** | § | |
| **JON HANNA, BRUCE BECKNER,** | § | |
| **GEORGE R. JENKINS, ROBERT** | § | |
| **LEGAULT, MICHAEL EDEGCOMB,** | § | |
| **UTE AMANN, ANAHIS BOLIVAR,** | § | |
| **MANOJ CHATLANI, NOBERTO** | § | |
| **MALCOTTI, ITALO BELON NETO,** | § | |
| **JOHN DOE, HECTOR PENA,** | § | |
| **CRISTIAN PALACIOS, FELICE** | § | |
| **PELLIGRINO, EDUARDO ROE,** | § | |
| **OSCAR SALAZAR, MIGUEL SERRANI,** | § | |
| **JUAN CARLOS VALENCIA,** | § | |
| **ANWAR AND MARIA C. PERBTANI,** | § | |
| **GILBERT VILLAVERDE,** | § | |
| **JOSE PENDAS, NICHOLAS AND** | § | |
| **SUSAN PESCATORE, RAUL SANCHEZ,** | § | |
| **JORGE EGOAVIL,** | § | **CIVIL ACTION NO. _____** |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **PERSHING, LLC,** | § | **JURY DEMAND** |
| | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## COMPLAINT

## I.     PARTIES

1.     Plaintiff, Patsy Weatherly ("Weatherly"), is an individual residing in Orange Park, Florida.

2.     Plaintiff, Edith Wichman ("Wichman"), is an individual residing in Fort Lauderdale, Florida.

3.     Plaintiff, Michelle Morrison ("Morrison"), is an individual residing in Montreal, Canada.  Morrison purchased her Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

4.     Plaintiff, Felix Bravo ("Bravo"), is an individual residing in Aventura, Florida.

5.     Plaintiff, Jon Hanna ("Hanna"), is an individual residing in Panama City, Panama. Hanna purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

6.     Plaintiff, Bruce Beckner ("Beckner"), is an individual residing in Panama City, Panama.  Beckner purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

7.     Plaintiff, George R. Jenkins ("Jenkins"), is an individual residing in Panama City, Panama.  Jenkins purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

8.     Plaintiff, Robert Legault ("Legault"), is an individual residing in Panama City, Panama.  Legault purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

9.     Plaintiff, Michael Edgecomb ("Edgecomb"), is an individual residing in Tegucigalpa, Honduras.  Edgecomb purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

10.     Plaintiff, Ute Amann ("Amann"), is an individual residing in Somerset, United Kingdom.  Amann purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

11.     Plaintiff, Anahis Bolivar ("Bolivar"), is an individual residing in Miami, Florida. Bolivar purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

12.     Plaintiff, Manoj Chatlani ("Chatlani"), is an individual residing in Panama City, Panama.  Chatlani purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

13.     Plaintiff, Norberto Malcotti ("Malcotti"), is an individual residing in San Jose, Costa Rica.  Malcotti purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

14.     Plaintiff, Italo Belon Neto ("Neto"), is an individual residing in Curitiba, Brazil. Neto purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

15.     Plaintiff, John Doe ("Doe"), is an individual residing in Valencia, Venezuela. Doe purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

16.     Plaintiff, Hector Pena ("Pena"), is an individual residing in Caracas, Venezuela. Pena purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

17.     Plaintiff, Cristian Palacios ("Palacios"), is an individual residing in Miami, Florida.

3

18.    Plaintiff, Felice Pelligrino ("Pelligrino"), is an individual residing in Caracas, Venezuela.  Pelligrino purchased her Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida

19.    Plaintiff, Eduardo Roe ("Roe"), is an individual residing in Lima, Peru. Roe purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

20.    Plaintiff, Oscar Salazar ("Salazar"), is an individual residing in Bogota, Colombia.   Salazar purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

21.    Plaintiff, Miguel Serrani ("Serrani"), is an individual residing in Buenos Aires, Argentina.  Serrani purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

22.    Plaintiff, Juan Carlos Valencia ("Valencia"), is an individual residing in Medellin, Colombia.  Valencia purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

23.    Plaintiffs, Anwar and Maria C. Perbtani (the "Perbtanis"), are individuals residing in Broward County, Florida.

24.    Plaintiff, Gilbert Villaverde ("Villaverde"), is an individual residing in Miami, Florida.

25.    Plaintiff, Jose Pendas ("Pendas"), is an individual residing in Miami, Florida.

26.    Plaintiffs, Nicolas and Susan Pescatore (the "Pescatores"), are individuals residing Memphis, Tennessee. At the time of the purchase of the CDs at issue, the Pescatores resided in Winter Garden, Florida.

27.     Plaintiff, Raul Sanchez ("Sanchez"), is an individual residing in Maracay, Venezuela. Sanchez purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

28.     Plaintiff, Jorge Egoavil ("Egoavil"), is an individual residing in Princeton, New Jersey. Egoavil purchased his Stanford International Bank CDs through the Stanford Group Company office located in Miami, Florida.

29.     Defendant, Pershing , LLC ("Pershing"), is a Delaware limited liability company doing business in Florida, with its principal place of business in New Jersey. Pershing may be served through its registered agent in Florida, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301. Pershing is a registered broker-dealer, is authorized to conduct business in Florida, and does conduct business in Florida.

## II.     VENUE AND JURISDICTION

30.     This Court has general diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between Plaintiffs and the Defendant.

31.     Venue is proper in the United States District Court in and for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## III.     FACTUAL ALLEGATIONS

### A.     Introduction

32.     In February 2009, Stanford Group Company ("SGC") and Stanford International Bank, Ltd. ("SIB") were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws. Five principals of the Stanford companies, including

R. Allen Stanford, were indicted on multiple counts of fraud; two of the individuals pleaded guilty and the other three were convicted by juries after lengthy trials (a copy of the Federal Indictment is attached hereto as Exhibit "A"). All five are currently serving sentences in prison.

33.     At the time of the raid, SGC had investor accounts totaling approximately $10 billion. Pershing was the custodian for those accounts and received large fees for its work with the Stanford companies. Another $7 billion, consisting of CD deposits and accrued interest, were reflected on the books of SIB. Pershing was not the custodian for the CDs, yet John Ward, Managing Director in the Global Securities Services business unit of Pershing, executed a sworn affidavit for the SEC attesting to the fact that Pershing wired $500,000,000.00 from clients' accounts at Pershing to purchase the CDs from SIB (*See* Exhibit "B"). Pershing did so despite its inside knowledge of facts that would have prevented any responsible corporation from doing business with SGC and SIB.

34.     During the criminal trials, federal prosecutors made it clear that thousands of employees and investors were deceived about the true nature of SGC, SIB and the program to sell CDs. Pershing played a major role in that deception as it actively told Stanford financial advisors that it had conducted extensive due diligence on the Stanford companies and was very "satisfied" with SIB. Pershing often described its relationship with Stanford as a partnership and worked to grow the business of Stanford. Internally, however, Pershing doubted the legitimacy of the CD program. Pershing did not believe that the representations in the sales literature were true, it did not believe the conclusions of SIB's auditor, and it did not see how SIB could generate the returns it promised investors. Despite this, Pershing continued to appease Stanford management so that it could keep reaping financial benefits from the billions of dollars in accounts it maintained. Even after Pershing's own investigation led it to conclude that SGC and

SIB were engaged in a fraud, and after Pershing quietly decided that it would no longer transfer funds from SGC to SIB, Pershing's only communication with the financial advisors and clients was a comfort letter in which Pershing exuded confidence in the ongoing relationship with Stanford.   As a result, Plaintiffs and countless investors and employees suffered massive financial losses.

### B.   The Stanford CD Empire

35.   In 1986, Allen Stanford began operating an international bank from the Caribbean island of Montserrat.   Initially named Guardian International Bank, the bank was subsequently moved to Antigua and renamed Stanford International Bank, Ltd.   During the years that followed, Allen Stanford established additional financial service companies that had clientele throughout the world.[1]   SGC was one such company.   SGC was a broker/dealer that began its U.S. operations in 1995.   SIB and SGC experienced consistent and impressive growth – by 2008, SIB books showed over $7 billion in customer deposits and SGC had more than $10 billion in assets held in its customers' brokerage accounts.

36.   While SGC offered a wide array of brokerage products, including traditional stocks, bonds and mutual funds, SIB offered essentially one product, a certificate of deposit ("CD").   Many SGC financial advisors introduced the CD to their qualified clients.   SIB paid a referral fee to SGC which, in turn, gave the financial advisors a commission.

37.   The SIB CD was unlike conventional CDs issued by U.S. banks.   Funds received from investors were pooled and purportedly invested in various investments.   The sales literature for the CD touted the product's safety.   Purchasers were told that money from the sale of CDs was allocated in a portfolio that contained equity, fixed income, alternative investments and

---

[1]       Ultimately, there were more than 80 operating companies worldwide.   To avoid confusion, the companies will be referred to collectively in this Complaint as the "Stanford companies" or "Stanford."   R. Allen Stanford will be referred to as "Allen Stanford."

precious metals.  SIB's annual report generally described the portfolio with some details about the investments, although the exact holdings of the portfolio were not disclosed to the financial advisors and investors.  Investors were also told that the portfolio was managed by several European money managers.

### C.    The Stanford Ponzi Scheme

38.    The above representations about SIB's portfolio, furnished to financial advisors and investors, were false.  What the financial advisors and investors did not realize was that the funds were not invested as described in the literature.  Almost all of SIB's funds were invested in private companies, companies that were traded over-the-counter or in the "pink sheets," real estate, and a $2 billion loan to Allen Stanford.   In short, Stanford employees and investors were deceived about Stanford's business model, investment strategy, financial strength and the safety and nature of the investments.

39.    In order to mask the fraud, revenue figures for SIB's assets were "reverse engineered" to arrive at desired levels.  James Davis, the Chief Financial Officer of Stanford Financial Group Limited ("SFGL"), oversaw the fabrication of the SIB financial statements.[2] After it was determined what level of revenue SIB needed to report in order to look good to investors, Davis' team would back into that total amount by assigning fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative investments) of a fictitious investment allocation.  Laura Pendergest-Holt, the Chief Investment Officer of SFGL, Gil Lopez and Mark Kuhrt, SFGL accountants, and Allen Stanford, CEO and the ultimate shareholder of

---

[2]       The United States District Court in and for the Northern District of Texas found that the Stanford fraud was a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."); *id.* at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme .   was a Ponzi scheme."); *id.* at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . ."). In an opinion filed on December 15, 2010, the United States Court of Appeals in and for the Fifth Circuit agreed with the District Court's findings that the Stanford fraud was a Ponzi scheme.

SIB and SGC, were all implicated in the fraud.  Davis and Pendergest-Holt pled guilty to federal charges and are serving sentences of five years and three years, respectively.[3]  Lopez, Kuhrt and Stanford were each found guilty following lengthy trials and were sentenced to 20 years (Lopez and Kuhrt) and 110 years (Stanford).

### D.     Early Detection of the Fraud

40.     Pulling off a fraud on this scale required hiring a credible sales force who could be misled into placing CDs with an unknowing public.  SGC hired reputable financial advisors, many of whom worked at major Wall Street firms, and deceived them with the financial information fabricated by Davis and his team.  By 2008, the CD had been offered for more than two decades with apparent approval by regulators and scrutiny by industry insiders.  All of this reinforced the notion that the CD was a bona fide product.

41.     The fraud, however, was detected by some with the tools and access to information that the advisors and investors lacked.  The SEC, as early as 1997, and Pershing, in 2006, were two entities that realized the SIB CD was not sustainable. Neither said anything, however, and the sales continued.

42.     The Securities and Exchange Commission ("SEC") became suspicious that Stanford was operating a fraudulent scheme during its first examination of SGC in 1997.  The SEC questioned the CD returns and concluded that Stanford was likely running a Ponzi scheme. The SEC reached a similar conclusion again the following year during another examination, fueling an internal debate between the examination and enforcement divisions of the SEC's Fort Worth Regional Office as to what action, if any, the SEC should take.  Finally, in June 2005, the

---

[3]     James Davis entered into a plea agreement with the United States Department of Justice and recited for the court the facts of his involvement in the Ponzi scheme.  It is attached hereto as Exhibit "C."

SEC opened a formal investigation of Stanford. At the same time, it made a referral to FINRA detailing a "possible fraudulent scheme" involving the CDs.

43.     For the next three and a half years, the SEC investigated the fraud. It issued subpoenas to third parties and communicated with industry insiders. Upon information and belief, Pershing was one of the industry insiders that the SEC contacted.[4]

44.     When the SEC finally moved in and raided SGC and SIB in February 2009, it quickly confirmed that SIB had nothing resembling $7 billion in safe, liquid investments. Purchasers of the CDs lost essentially everything they had put into SIB, and financial advisors and other employees suffered massive damages to their careers and reputation.

### E.     Pershing Pursued An Active Role In The Business Of SIB and SGC

45.     Pershing, too, came to believe Stanford was engaged in fraud. Unlike the SEC, Pershing decided to partner with Stanford and benefit from the relationship. When Pershing joined forces with Stanford, it was determined to help "grow the business." It is, therefore, no coincidence that sales of the CDs exploded with Pershing at Stanford's side. From 2005 through the end of 2008, SIB reported that its CD deposits had increased from $2.8 billion to more than $7.2 billion. (By comparison, it took 15 years – from 1986 through 2001 – for deposits to reach $1 billion.)

46.     During this time of explosive growth, Pershing played a substantial role in the sale of the CD to an unknowing public. Indeed, in 2005, Pershing sent an email to SGC in which it referred to the Stanford relationship as a *"partnership"* and promised to take *"an active role in complimenting the future growth"* of SGC.

---

[4]     When the SEC filed its action against Stanford on February 16, 2009, it included an affidavit from Pershing Managing Director, John Ward (Exhibit "B"). As discussed *infra,* Pershing said nothing to unsuspecting Plaintiffs who were clients of Pershing.

47.     To help Stanford, Pershing studied the Stanford business model, materially aided the Stanford entities at all levels, and actively assured financial advisors and investors that the CD program was legitimate. As a result, investors purchased more CDs and continued to hold existing CDs. Privately, though, Pershing doubted everything SIB told investors about the CD, including the way the proceeds were invested, how the returns were generated and the accuracy of the financial records.

### F.     The Pershing-Stanford Relationship

48.     In May 2005, Pershing began discussions with Stanford management about taking over the role as custodian and clearing firm for SGC.

49.     One of the earliest meetings between Pershing and Stanford personnel took place at Pershing's headquarters in New Jersey. Pershing's senior management was involved in forging the relationship with Stanford. Claire Santaniello, Pershing's Chief Compliance Officer, and John Ward, the Relationship Manager mentioned above, were two of the principals involved in the New Jersey meeting. At the outset, James Davis wanted the credibility of having a relationship with a firm like Pershing. As demonstrated below, that credibility was used time and time again to increase the sale of CDs. Pershing was willing to give legitimacy to the Stanford enterprise in exchange for SGC's business.

50.     To further the partnership, Pershing agreed to provide a service to Stanford that went above and beyond the clearing and custody of securities: international wire transfers for the purchase and redemption of SIB CDs by SGC customers. SGC told Pershing that it would require Pershing to wire money from client's accounts for the purchase of CDs. On October 12, 2005, Managing Director John Ward sent an email confirming to Stanford that, as to the wire transfer business between SGC and SIB, *"[w]e fully understand the nature of the relationship*

*and the reason for these movements."*   The following week, Pershing Vice President Ron Artzi sent an email stating that Pershing was *"excited to have the opportunity to partner"* with Stanford Financial, and that Pershing representatives were confident that they *"thoroughly understand the unique compliance and legal requirements associated with servicing"* the Stanford business.   Ward and Artzi were part of a three-member team of "Relationship Managers" assigned to grow Stanford's business.   The third member was a fellow Pershing executive named Edward Zelezen.

51.   The aspect of Stanford's business that attracted Pershing was the billions of dollars in assets held in SGC accounts that did not include SIB CDs.   In other words, Pershing was more than willing to engage in highly suspect activities, such as wiring funds to offshore banks, in exchange for a contract to process Stanford's multi-billion dollar, non-CD securities transactions. Pershing recognized that a Stanford partnership was worth millions of dollars in clearing fees, a fact that would cause it to become inextricably intertwined with Stanford's criminal activities as a knowledgeable and willing co-conspirator.

### G.   Pershing Becomes Aware of Suspicious Activities During Its Due Diligence of Stanford

52.   Eager for Stanford's business, Pershing spent eight months conducting due diligence on SGC, SIB and related entities.   Pershing undertook an investigation of the broker-dealer, including its business model, client base, type of investments, transactional volume, its financial position, its management, any specific needs related to custody of the assets, and any other information that might be relevant.

53.   Pershing's due diligence included multiple trips to Antigua.   Pershing met with SIB personnel and examined the bank's books and records.   Pershing reviewed arbitration and court cases against Stanford companies.   It also reviewed the books of SGC and related

companies.  Following the review, Pershing signed a contract to be the clearing firm for SGC in December 2005.  The clearing agreement became operational in early 2006 and was fully implemented in late November 2006.

54.    Throughout this process, Pershing had access to confidential information and became aware of troubling facts about the Stanford business model.  There was tension at Pershing between those pursuing the relationship with Stanford and those responsible for identifying problems.  Unfortunately, the business side won and Pershing never took any meaningful action to distance itself from the illegal activities perpetrated by the Stanford companies. For example, during its relationship with Stanford, Pershing discovered that:

- Stanford forfeited more than $3 million in deposits linked to a Mexican drug lord;

- SGC was being actively investigated by the SEC;

- SGC's survival was dependent on revenues generated by referral fees from marketing and promoting SIB CDs (CD-related fees constituted 71.65% of SGC's revenue in 2004 and 63.62% in 2005);

- Pershing had never seen the investment portfolio maintained by SIB;

- The people running SGC did not know what was in the SIB portfolio;

- Essentially the entire SIB portfolio was managed by Davis and Pendergest-Holt, neither of whom had the education or training to manage such a massive portfolio;

- The financial condition and financial statements of SIB were audited by a one-man accounting firm in Antigua, C.A.S. Hewlett & Co., Ltd. – an accounting firm that no one at Pershing had ever heard of;

- Financial regulators in Antigua (the  Financial Services Regulatory Commission, or "FSRC") had no work papers or documentation supporting the assets that SIB claimed to own;

- It was the regular practice of the FSRC to just accept at face value whatever SIB told the FSRC about its financial condition and portfolio values;

- Unlike anything Pershing had ever seen before, SIB showed a profit in good times and in bad.

55.     Despite these glaring red flags, Pershing recklessly continued to provide substantial assistance to Stanford by servicing the Stanford companies and transferring millions of dollars of Plaintiffs' money to purchase CDs and fund the fraudulent scheme.

### a.  Pershing Materially Aided Stanford with the Sale of CDs

56.     Pershing's assistance went far beyond clearing trades and transferring funds for the purchase of CDs.  Pershing took many active steps to promote the sale of CDs and support the business of Stanford.

### b.  Pershing Vouched for SIB

57.     Beginning in 2006, Pershing had meetings with groups of financial advisors, as well as one-on-one meetings in Houston, Baton Rouge, Miami and other locations for the purpose of validating the SIB CD program.   These meetings were attended by Pershing executives who told financial advisors how excited they were to be working with Stanford. Relationship managers Ward, Artzi and Zelezen attended these meeting, as did others from Pershing.   Pershing executive Chris Fulco explained that Pershing and Stanford "spoke a common language" because each was affiliated with a bank.  Fulco told financial advisors that about 80% of Pershing's year-long due diligence into Stanford was focused on SIB because Pershing understood that the CDs were the primary source of revenue for Stanford.   Fulco reported that Pershing made several site visits to the bank in Antigua, that it was given transparency into SIB and that Pershing was satisfied with what it found.  Fulco told financial advisors that Pershing "dove deeply into the portfolio of the bank." The objective was clear – to give the endorsement of the bank that James Davis wanted from Pershing.

### c.  Pershing Trained SGC Branch Managers

58.     Additionally, Pershing executives met with SGC Managing Directors (branch managers from the various SGC offices) in the Stanford Training Center in Houston, Texas. The managing directors were flown into Houston to hear Pershing's presentation. Pershing explained its due diligence and discussed its enthusiasm for the relationship with the Stanford enterprise. This meeting was intended to sell the Pershing-Stanford relationship to the branch managers who, in turn, were expected to take the information back to the financial advisors they oversaw.

### d. Pershing Helped Recruit the SGC Sales Force

59.     From 2006 through 2009, Pershing played a central role in recruiting preeminent financial advisors to SGC. Much of Stanford's growth during this time came from a focused effort to recruit top talent from major brokerage firms. Prior to working at SGC, this select group of financial advisors had successful careers with valued clients. Relying on representations made to them during the recruiting process, these financial advisors came to believe that the move to Stanford was an opportunity to work in a boutique, full-service environment that catered to their clients. They had no prior experience with the SIB CD at their former firms.

60.     As part of the recruiting process, financial advisors were invited to the Houston office where they listened to presentations intended to induce them to come work at SGC. Pershing personnel, including Ward and Zelezen, participated in the recruiting sessions. During their presentations, Ward and Zelezen would tell the potential employees about Pershing's partnership with Stanford. They told the financial advisors that they had vetted the Stanford companies. Capitalizing on the recognition of Pershing and its parent, Bank of New York Mellon, Ward, Zelezen and others made clear they were partnering with Stanford after conducting a thorough due diligence examination of the organization.

61.     To the recruits, many of whom had never heard of Stanford before, the support and endorsement by Pershing and Bank of New York gave instant credibility to the Stanford enterprise.  Consequently, the representations of Pershing concerning SIB carried a tremendous amount of weight and were an integral part of the financial advisors' decision to work at Stanford.

62.     The ranks of financial advisors increased at SGC as a result of Pershing's efforts. Not surprisingly, the sales of CDs increased as well. Pershing's actions cloaked the whole operation with credibility and authority, ultimately influencing the financial advisors' recommendations to buy or hold CDs.

63.     Even after financial advisors were recruited, Pershing executives continued to validate the Stanford enterprise as they attended the "Top Producers Club" meetings.  These meetings were held at destination resorts.  At these meetings, Pershing met and socialized with the financial advisors to assure them, again, of the strength of the Pershing-Stanford partnership. Pershing also participated in golf tournaments and other gatherings with Stanford financial advisors.

64.     These various meetings between Pershing and Stanford employees included financial advisors and other employees who sold CDs to investors outside of the United States. Thus, Pershing's assurances were intended to promote sales of CDs worldwide and were not limited to only the investors who maintained accounts at Pershing in the United States.

65.     The ongoing assurance of Pershing was a large factor in decisions to buy and hold CDs. The financial advisors and other employees did not have the same degree of access into the bank's portfolio as Pershing.  Being told that Pershing had transparency into the bank and was

"satisfied" validated the CD program, assuaged any concerns and encouraged the financial advisors to sell more CDs or recommend that their clients hold existing CDs.

### e. Pershing Moved Funds Offshore to Purchase CDs and Onshore to Redeem CDs

66.    Pershing assisted with CD sales by transferring funds from client accounts held at Pershing for CD purchases. Importantly, Pershing used its professional expertise and discretion in deciding whether to process orders and execute transactions.[5] Moreover, when investors received money from their CD investments at SIB (whether it was interest or the return of their principal), Pershing transferred the funds into SGC accounts where Pershing served as clearing agent. Pershing benefitted from every dollar that it transferred from SIB to SGC – dollars which were subsequently invested into securities held by Pershing.

67.    In many instances, Pershing was instrumental in moving the CD proceeds from its offshore custodian, SIB, to other financial institutions throughout the world. Pershing knew the source of the funds it was transferring (SIB), and it made a fee from providing this additional support to the Stanford enterprise.

68.    Every time that Pershing transferred funds from SIB to SGC, Pershing further perpetuated the fraud by giving account holders and their financial advisors the appearance that the CDs were generating returns when, in fact, Pershing doubted that the CD portfolio existed and it questioned how SIB could be generating any profit. The transfers by Pershing validated the entire CD program by (1) giving false profits to investors, and (2) furthering the illusion that

---

[5]    In a case involving similar allegations that Pershing aided Stanford with the fraud, the United States District Court for the Northern District of Texas has already determined that "Plaintiffs have alleged sufficient facts to show that Stanford-affiliated parties were guilty of a primary violation of the Texas Securities Act, that Pershing had a 'general knowledge' of the violation, and that Pershing substantially assisted the violation." *See* Order dated November 14, 2012, page 11, in *Carolyn Kneese, et al. v. Pershing, L.L.C.*, Case Number 3:2010-cv-01908, attached as Exhibit "D."

depositors had security since depositors could withdraw interest or terminate the CD at any time and receive a return of principal.

### f. Pershing Extended Credit to Purchase CDs

69.     Pershing substantially assisted in the sale of SIB CDs in additional ways.  Upon information and belief, Pershing extended credit to customers to enable them to purchase CDs. Pershing provided loans and margin financing for Stanford customers to purchase CDs, and Pershing received interest on such loans. Joseph Spatucci, a Vice-President of Wealth & Credit Management at Pershing, was one of the individuals that routinely worked with financial advisors and operations personnel at SGC to assist investors with financing matters and facilitating transactions.

### g. The Pershing – SIB Consolidated Statement

70.     Pershing was also involved in a Consolidated Statement project with Stanford that reported to clients the "performance" of the CDs.  The statements gave the false impression that the CD generated returns and was protected by SIPC.  Upon information and belief, the statement was developed as a result of cooperation between Pershing and James Davis.  Pershing provided a direct feed of its data to Stanford for the creation of the statement, knowing that its data would be reported along with the SIB CD returns in one, unified statement.  The statement reflected fictitious returns on CDs, returns that Pershing was questioning, and contained the Stanford logo and phrase "member NASD/SIPC" even though Pershing knew the CDs were not insured by SIPC.  This consolidated statement could not have been created without the assistance of Pershing.  At the time of the shutdown, Pershing was evaluating new software with Stanford that would similarly be used to generate consolidated statements.

### h. Pershing Assisted Stanford Outside the United States

71.     Pershing also promoted the Stanford CDs through its actions outside the United States. Pershing played a large role in the sale of CDs in Latin America. For example, Pershing was the custodian and clearing firm for Stanford's brokerage firms in Latin America. Pershing routinely wired funds to purchase CDs from client accounts throughout Latin America to a SIB account at Toronto Dominion Bank in Canada. In addition, Pershing was working with Stanford to sell CDs through an international mutual fund which it helped establish and which it intended to maintain as custodian.

### i. Pershing Supported Other Stanford Initiatives

72.     Pershing had several other projects with Stanford. Ward and Zelezen made frequent visits to Memphis to meet with Jim Davis and Laura Pendergest-Holt. Davis and Pendergest-Holt routinely referred to their "partnership" with Pershing. Pershing representatives met with Stanford analysts in Memphis, as well. In 2008, Ward was involved in Stanford's efforts to create several hedge funds, one of which was managed by Pendergest-Holt's husband.

### j. Pershing Assisted SGC's Operations

73.     Further, Pershing played a substantial role in the operations and compliance of SGC. Pershing assisted the Managing Directors and their Operations Managers at SGC, consulting on matters that included operations and compliance. Pershing was deeply enmeshed with the Operations Managers at the SGC branches from 2006-2009. Pershing made it clear that it was there to help facilitate SGC's business and participated in regular meetings and conference calls. The meetings were held in Houston, Texas, as well as the individual branches, including the Miami branch.

### k. Pershing's Reporting Duties

74.     Apart from its activities at SGC's offices, Pershing had a duty to monitor the net capital of SGC to make sure it was in compliance with regulatory requirements.  Also, under the Patriot Act, Pershing had a duty to report any suspicious activities that could possibly involve money laundering.[6]  Pershing was well aware of international transfers to and from SIB, and admitted in 2009 that it was responsible for at least $500,000,000 in transfers offshore.  (Pershing has not yet admitted how much more money it transferred from SIB to other destinations).  In short, SIB could not have done business, including its primary business of selling CDs, without the continuing assistance of Pershing.  This assistance was in the form of training management, recruiting financial advisors, lending money to investors, moving funds around the world and staying silent about suspicious activities.  And, as demonstrated in the following section, all of this was done while Pershing had great suspicions.

### H.     Pershing Continued Its Assurances to Financial Advisors Despite Internally Doubting Everything About the CD Program

75.     While Pershing openly gave assurances to financial advisors, it secretly doubted everything it had reviewed concerning the CD program, including the sales brochures, SIB's

---

[6]     In light of the numerous and unmistakable signs of money laundering by Stanford explained herein, Pershing cannot claim it was not aware of Stanford's money laundering activities or that it was merely engaged in the ministerial activities of clearing trades. *See Matter of Howard,* 167 B.R. 684 (Bkrtcy.M.D.Fla. 1994) (Carelessness is distinguished from "blind willful behavior" or a conscious avoidance of enlightenment such as deliberately ignoring the obvious.); *U.S. v. de Francisco-Lopez,* 939 F.2d 1405 (10th Cir. 1991) (deliberate ignorance is defined as a conscious purpose to avoid enlightenment or intentional avoidance of knowledge.); *U.S. v. Morales,* 577 F.2d 769 (2nd Cir. 1978) (jury entitled to disregard appellant's denial of knowledge if it found conscious avoidance.).

Important to the evaluation of Pershing's conduct is the fact that money laundering is a federal crime, prohibited by Title 18, United States Code, Section 1956 and which is described in that section as follows:

> Whoever, knowing that the property involved in a financial transaction represents some form of unlawful activity, conducts . . . a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . .

investment portfolio and the ability of SIB to consistently produce positive returns. Pershing had uncovered many red flags during its initial due diligence period in 2005. Pershing's awareness of the Stanford fraud increased from 2006 through 2009, primarily through the efforts of an internal risk manager at Pershing, Richard Closs. Closs brought the overwhelming evidence of fraud to Pershing's attention, however, Pershing refused to take any steps that would interfere with its serving as SGC's custodian and clearing firm. As a result, Pershing continued to materially aid Stanford until federal regulators closed the firm in February 2009.

76.     Richard Closs began working for Pershing in the middle of 2006. Shortly after arriving at Pershing, Closs was asked to dig deeper into the relationship with Stanford. As he reviewed financial information about SGC, he became concerned about its relationship with and dependence on SIB. He also became suspicious about SIB's ability to generate the returns that were being reported. According to John Ward, Pershing noticed in the middle of 2006 that SGC was losing money. Since SGC was receiving a significant portion of its revenue from SIB, Pershing was internally concerned about SIB, capital contributions and the "sustainability" of SGC.

77.     Closs asked SGC about the SIB portfolio, and was directed to Pendergest-Holt in August 2006. The President of SGC, Danny Bogar, arranged for a conference call between Closs, Ward and Pendergest-Holt. The call took place around August 31, 2006. According to Bogar, Closs "started bombarding her with questions." Closs asked for verification of the assets in the SIB portfolio and the returns it generated. Pendergest-Holt did not answer Closs' questions and abruptly ended the call. Bogar said the call "did not go well."

78.     In the fall of 2006, Closs visited the Houston office of SGC to gather more information.  Pershing was closely monitoring SGC because it was in the red and losing money. Closs began requesting financial statements from the Chief Financial Officer of SGC.

79.     Closs was also aware of the SEC's investigation into Stanford.  Bernie Young, the Chief Compliance Officer at Stanford, provided details of the investigation to Closs.

80.     Pershing's suspicions deepened.  After some internal discussion and meetings with SGC, in June 2007, Ed Zelezen, a member of the Relationship Management team subordinate to Ward, asked Young for the SIB CD prospectus.  On receipt of the CD disclosure document and subscription agreement, Closs emailed Young: "I was also looking for a list of the underlying investments and where they are held . . .   I would usually see that in the prospectus."  Based on Closs' email, it appears that previous comments by Pershing to financial advisors that it was "satisfied" with the CD appear to have been made without any consideration of the offering literature.

81.     At the same time, Pershing had a meeting in Miami with Bogar on June 6, 2007, to discuss the SIB portfolio.  John Ward attended the meeting with Frank LaSalla, his boss at Pershing.[7]   Ward wrote to Bogar the next day and said that Pershing was committed to Stanford's growth, but wanted to understand how SIB could continue to generate returns.  He also said that Pershing needed to "gain an understanding of the SIB portfolio" – a jarring admission that Pershing did not "dive deeply" into the portfolio as had been represented to financial advisors or, more accurately, that Pershing was actively concealing relevant information from the financial advisors and investors.

---

[7]     LaSalla was a member of the Executive Committee for Pershing and the Operating Committee of Pershing's parent, BNY Mellon.  He was also responsible for all of Pershing's business activities outside the United States.

82.     Pershing did not receive the information that it requested from Bogar.  The lack of a meaningful response to a request for portfolio details was a red flag that should have stopped Pershing in its tracks.  Notwithstanding this, Pershing never expressed its concerns to customers or financial advisors who were relying on Pershing's assurances, and Pershing continued Stanford's business as usual.

83.     Closs also asked the Chief Financial Officer of SGC, Chuck Weiser, for more information concerning SIB.  Weiser prepared a binder of information in response to Closs' request, including the identities of three external managers that handled some of the SIB portfolio.  The managers only handled a sliver of SIB's portfolio and it was impossible to account for SIB's reported revenue on the basis of three managers.[8]  The information about the managers could not be reconciled with the 2006 SIB financial statements which Closs reviewed at the same time.  In reckless disregard of information that was contrary to what investors were being told, Pershing continued to transfer its clients' money to Antigua for the purchase of CDs, and move CD proceeds from Antigua to other parts of the world.

84.     On August 8, 2007, Pershing executives Closs, Ward and LaSalla met with Bogar and James Davis in Davis' office in Memphis.  The purpose of their meeting was to discuss the relationship between their companies, as well as Pershing's request for more information about SIB.  They made unequivocal requests for transparency in the bank.  It was "pretty important" to LaSalla and Closs that their concerns about SIB's "sustainability" be addressed.  Ward knew that the information he had received concerning three managers was meaningless.  Following the meeting, Ward sent an August 27, 2007 email requesting: (1) details on the external managers;

---

[8]     SIB told Pershing its portfolio was invested through 20 managers in Europe, overseen by Pendergest-Holt and her team.  Later, Pendergest-Holt testified that the 20 managers her team monitored only oversaw 10% of the portfolio.

and (2) statements reflecting the total assets maintained by SIB.  The requested information was never provided to Pershing.

85.     In November 2007, Pershing learned that the Financial Industry Regulatory Authority ("FINRA") fined SGC for distributing sales literature about the CD which contained "misleading, unfair and unbalanced information."  The FINRA action was public and noticed by Pershing executives, some of whom were serving on FINRA committees.  Coupled with the inside information Pershing had about the Stanford enterprise (which included Stanford's refusal to give other information), Pershing's concerns about fraud were escalating.

86.     After Closs began asking questions, Pershing hired an outside law firm to further investigate possible fraud involving SIB.  Upon information and belief, Pershing had knowledge of Stanford's illegal activities and was internally referring to the Stanford enterprise as a fraudulent scheme.[9]

87.     Pershing worked hard to ensure that its public persona did not betray its private concerns.  And the concerns were mounting.  In January 2008, Pershing representatives, John Ward and Tres Arnett, travelled to Antigua again to examine SIB's balance sheet and meet with the Antiguan banking authority, the FSRC.  On that trip, Pershing did not get to see a balance sheet and it learned that the FSRC had no work papers or any documents of any kind supporting the assets that SIB claimed to own.  Pershing also discovered that it was the regular practice of the FSRC to just accept at face value whatever SIB told them about the financial portfolio.

---

[9]     One of the partners at the law firm was aware of the SEC examinations in 1997, 1998 and 2002 which reported that Stanford looked like a Ponzi scheme.  He had worked for the SEC and knew that four law enforcement agencies, including the United States Department of Justice, the Federal Bureau of Investigation, United States Customs and the Internal Revenue Service had informed the SEC they were conducting criminal investigations of their own into the Stanford enterprise.  The partner at the law firm specifically knew of the four investigations because all four letters were directed to him personally as the District Administrator of the Fort Worth office of the SEC.

88.     After the trip to Antigua, Ward and Richard Breukner, Pershing's CEO, had another meeting in Memphis with James Davis and Bogar. Breukner told Davis that he was there because of the issue of "sustainability of the referral fees." Breukner pointed out that Pershing has an obligation to know its customers and to conduct ongoing due diligence.

89.     Pershing made it clear it did not trust the one-man auditing firm in Antigua, Hewlett. Pershing wanted financial information that was independent from Hewlett. The Pershing executives said they would be "flexible" in how they got the information and they dropped their earlier demands to see the information first hand. Ward confirmed on March 17, 2008 that Pershing "would accept a certification by a U.S. domiciled recognized accounting firm" that "they have conducted a review of [SIB's] assets and that in their professional opinion [the assets] are reflected accurately."

90.     Rather than being flexible, Pershing should have severed its relationship with all Stanford companies. Instead, to line its own pockets at the expense of unwary investors, it steadfastly continued to support SGC as custodian, clearing firm, recruiter, trainer and facilitator. It ensured constant revenue for SGC by faithfully wiring hundreds of millions of dollars to SIB, which in turn paid fees to SGC. By 2008, Pershing had a clear choice: continue to make massive fees based on approximately $10 billion in SGC assets, or forego the fees by ending a relationship with an organization that it believed was engaged in fraud.

91.     Unfortunately for all those that relied on Pershing, Pershing decided to act in its own interest and stay the course. Months went by without the desired review by an accounting firm. Pershing said it wanted to see the offering materials reconciled with the investments reflected in SIB's books, and the SIB books reconciled with the custodian's records, and it wanted confirmation that the investments were managed by independent managers, not

Stanford.[10]   Pershing and Stanford agreed that the international accounting firm of Grant Thornton would do the review, but the review never took place.

92.    In complete disregard for all it had seen and, more importantly, what it had not seen, Pershing was recklessly focused on continuing its relationship with Stanford.   Frank LaSalla wrote on October 10, 2008, that it was important "to get this matter behind us as quickly as possible."   A few days later, on October 15, 2008, Grant Thornton suggested by email that "the best course of action" would be to look at copies of the Antiguan auditor's work papers in Houston, with "maybe a call or two to the bank" if there are any questions.   Grant Thornton wrote: "Doesn't seem like enough to send someone to Antigua to complete.   I am estimating that a manager here in Houston could complete the steps in less than a few hours.   Writing the report and reviewing will take a few more hours but it sure seems like if we can avoid the travel time to Antigua we can do this for a lot less fees than if we have to send someone there for the day.   So the cost for this method would probably be in the neighborhood of $4,500 plus our standard 6% for admin."   John Ward reviewed Grant Thornton's email about the review and costs, and "thought they were reasonable."

93.    As a result of its concerns, upon information and belief, Pershing notified its insurance carrier, CAPCO, in 2008 of a possible fraud involving Stanford.   In December 2008, Pershing announced that CAPCO had decided that it would not renew its insurance coverage of Pershing.   CAPCO's coverage lapsed on February 16, 2009, just one day before the raid on Stanford.

---

[10]    Additional concerns surfaced during this period.   In January 2008, two former Stanford employees claimed that Stanford was engaged in fraud involving the falsification of its financial statements.   The SEC began working with the employees and, in the summer of 2008, Bloomberg ran an article discussing the SEC's investigation and the whistleblowers.   Pershing followed these events and contacted Bogar on August 18, 2008 to discuss the press reports.

94.     Pershing had no discussions with Stanford about terminating its clearing relationship with SGC.  Pershing had internal discussions about ending its relationship with Stanford but, in the end, did nothing to interfere with the fees it got for supporting SGC.  In fact, John Ward said he never intended to terminate the relationship with SGC.  In October 2008, Pershing CEO Breukner met with R. Allen Stanford in New York.  Later, Pershing sent a letter to Stanford which said: "To Stanford Team:  As validated in your meeting with your CEO last week, Pershing remains committed to our partnership with Stanford."

95.     Pershing did decide, however, that it needed to protect itself and have "nothing more to do with SIB," at least insofar as international wire transfers.[11]  In order to have the appearance that it distanced itself from the fraud, Pershing notified SGC on December 12, 2008 that it would no longer process wire transfers to SIB for the purchase of CDs.  It also told Stanford at the same time that it was increasing tenfold the escrow amount that Pershing required from SGC as a deposit, from $500,000 to $5 million.  Pershing did nothing, however, to notify customers of its concerns or notify them that it had changed its mind about doing business with SIB.  Moreover, Pershing did not take any steps to correct false statements about how "satisfied" it was with SIB.  Clearly, Pershing was trying to hold on to SGC's business while avoiding the appearance that it was assisting SIB with a fraud.

96.     Pershing's intent is best exposed by what it did next:  based on a request from Stanford, Pershing agreed to continue wire transfers for an additional 30 days as long as they were processed through an intermediary escrow account at the Bank of Houston.  In other words, Pershing was so concerned that SIB was running a fraudulent scheme, it wanted the appearance

---

[11]     Pershing was still planning to operate a mutual fund that invested in CDs and it continued to recruit financial advisors who, Pershing knew, would increase the sale of CDs.

it was not involved.  In order to maintain a good business relationship with SGC, however, it knowingly assisted Stanford in selling CDs to Pershing's clients.

97.     Consistent with this, Pershing never shared its findings, concerns or doubts with either its clients or the financial advisors.  Nor did Pershing retract earlier representations that it was excited to partner with Stanford.  Instead, Pershing sent a "comfort letter" to financial advisors in December 2008 telling them that *"[a]t Pershing, we take great pride to support your business and make every effort to ensure your client's assets are protected."*  The letter touted Pershing's strength, its layers of insurance protection, BNY Mellon's market capitalization of $32 billion, and the fact that Pershing *"serves many of the world's most respected financial organizations."*  Pershing communicated this in the form of a Frequently Asked Questions for Investment Professionals, a Pershing Bulletin dated December 12, 2008 and a Sample Client Letter, all of which are attached as Exhibits "E," "F" and "G."  Pershing has admitted that this letter was intended to increase confidence.  Incredibly, this public communication was dated December 12, 2008, the same day that Pershing was privately telling Stanford it was going to stop transfers to SIB and the day after the revelation of the Madoff Ponzi scheme.

98.     Pershing was diligently pursuing its business relationship with SGC although it had decided that it no longer wanted an apparent affiliation with SIB.  On February 2, 2009, Pershing wrote SGC:  "We feel that one way we can better partner with Stanford regarding these changes is to be more proactive in communicating with the appropriate people at your firm . . . At a bare minimum, we envision having a monthly credit markets call with Pershing credit, margin, and Treasury departments."  At the same time, Pershing showed Stanford that it looked forward to moving ahead with their relationship by agreeing to reduce its escrow requirement, refunding the $5 million that it had only recently demanded.

99.   If Pershing had told its customers the truth, they would have not purchased CDs, nor would they have held the CDs they owned.  Had Pershing told the truth, there is no question that Stanford financial advisors would have not sold SIB CDs and they would have left SGC for other firms.  If Pershing put its duties in front of profits, as the law requires it to do, hundreds of millions of dollars in losses could have been avoided, and long-standing careers and reputations would not have been lost.

100.   In February 2009, the SEC filed a civil enforcement action against SGC, SIB and Allen Stanford, and the house of cards collapsed.  Every investor, including many of which placed their entire life's savings in SIB CDs, lost everything; and Pershing is the reason.  Indeed, the colossal Ponzi scheme could never have been perpetrated but for the knowing and willing assistance of Pershing.

101.   As is evident from the chain of emails referenced above through December 12, 2008, Pershing asked SGC for the specific investment portfolio purportedly created by SIB with funds paid by investors for the bogus CDs.  Despite the fact that many, many months passed during which time SGC did not provide Pershing with any information concerning the purported underlying investments, Pershing continued to process transactions.

102.   Additionally, despite not having the least bit of information about SIB's investment portfolio, Pershing, by and through Pershing employee Christopher A. Fulco, and perhaps others, disseminated false and fraudulent information to Stanford financial advisors.  Specifically, Pershing advised the financial advisors that Pershing executives had actually traveled to SIB in Antigua and had, *indeed,* seen the precise investment portfolio created by SIB first-hand, and that the portfolio consisted of the "conservative" investments touted by Stanford.  In truth and fact, the information that Pershing was spreading throughout the United States was

false and fraudulent, proven by the many emails sent by Pershing executives to SGC executives as detailed in this Complaint.

103.   The false information generated by Pershing spread quickly throughout its customer base, falsely assuaging concerns of existing investors and causing more and more investors to invest and reinvest in CDs.  The fraudulent concealment by Pershing of the true state of affairs helped to perpetrate the Ponzi scheme and actually helped it grow exponentially in size. Moreover, Pershing materially misled the CD investors, led them to falsely believe that they were conservatively invested, and concealed the truth from the investors that they were being defrauded.  Indeed, only recently did Pershing's acts of fraudulent concealment, by and through Fulco and others, come to the attention of the Plaintiffs.

104.   Pershing, a sophisticated and experienced clearing broker, acted with conscious indifference, conscious avoidance of enlightenment and with reckless disregard for the fact that the offering of SIB CDs through SGC was an illegal, unregistered public offering.  For instance, Pershing ignored that: (1) SIB generally solicited CD investors through media ads in violation of Reg. D; (2) Stanford was using its website to generally solicit CD investors in violation of Reg. D; and (3) many thousands of investors purchased the CDs.

105.   In providing those services, Pershing acted with reckless disregard for the truth and conscious avoidance of enlightenment of the fact that it was laundering money because, as described above, Pershing became aware of multiple glaring red flags as a result of its review in 2005.  For example, Pershing knew that the Stanford-related companies were under investigation by the SEC; Pershing developed deepening suspicions about the legitimacy of SIB early on; and because its suspicions grew exponentially throughout 2008, it culminated in the cessation of its wiring funds offshore when Bernie Madoff was arrested.  Despite its knowledge of the formal SEC

investigation and despite its knowledge that no one seemed to know where the money from the CD sales was going or what assets backed up the SIB CDs, Pershing recklessly continued to provide substantial assistance by transferring millions of dollars to SIB to fund the purchase of SIB CDs. Indeed, lured by the staggering amount of fees it was earning from Stanford's business in clearing non-CD securities purchases and sales, and despite SGC's consistent refusal to provide the verifiable backup on SIB that Pershing itself demanded concerning the composition of the SIB portfolio, Pershing still did not stop its wire business directly to SIB until the day after the Madoff Ponzi scheme was unveiled on December 11, 2008.[12]   Even then, Pershing used an intermediary bank (Bank of Houston) to continue facilitating the flow of cash to SIB for CD purchases.   Moreover, Pershing continued its clearing function for all Stanford non-CD securities business without skipping a beat up to the point in time that the SEC filed its action in February 2009.

106.   Pershing fraudulently concealed from Plaintiffs their deeply held suspicions of the illegal activities of the Stanford-related companies and, indeed, actively concealed its knowledge by giving fraudulent advice to Stanford financial advisors, rendering all causes of action set forth in this Complaint timely made.

**COUNT ONE:**
**SALE OF UNREGISTERED SECURITIES UNDER**
**THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**

107.   Plaintiffs repeat, reallege and adopt paragraphs 1 through 106 above as if fully set forth herein.

108.   Plaintiffs each purchased CDs between December 2005 and December 2008, during which Pershing acted as the clearing broker.

---

[12]   Pershing's stoppage of wiring funds to SIB *the day after* the Madoff scandal went public speaks volumes about Pershing's knowledge of the money laundering activities of Stanford and its own complicity.

109. Pershing violated the Florida Securities and Investor Protection Act, Fla. Stat. section 517.211, by aiding SGC in the sale of unregistered securities offered in violation of section 517.07 of the Florida Securities and Investor Protection Act.

110. The CDs, sold to the Plaintiffs, are securities as defined by section 517.021(21) of the Florida Securities and Investor Protection Act. The CDs were sold to the Plaintiffs in violation of section 517.07 of the Florida Securities and Investor Protection Act as they were not registered, and are not exempt from registration under the Florida Securities and Investor Protection Act. The sale or offer of the CDs thus constitutes a violation of section 517.211 of the Florida Securities and Investor Protection Act.

111. Pershing had general awareness of its role in the violations, rendered substantial assistance in the violations, and either intended to deceive the Plaintiffs, or acted with reckless disregard for the truth of the representations made by SGC.

112. Pershing substantially assisted in the violations by failing to disclose information to the Plaintiffs or to government regulators. Pershing had a duty to disclose that information to the Plaintiffs, and to the government regulators.

113. Pershing's conduct satisfies section 517.211(1) of the Florida Securities and Investor Protection Act, which renders each person or agent jointly and severally liable.

114. Pershing personally participated in and/or aided the sale of the CDs with knowledge that the offer was not exempt from the Florida Securities and Investor Protection Act registration requirements.

115. The actions of Pershing have caused the Plaintiffs to sustain damages and losses. Pursuant to section 517.211(3)(a) of the Florida Securities and Investor Protection Act, Plaintiffs

are entitled to recover the consideration they paid for the CDs, plus interest thereon, or actual damages, together with interest thereon.

116.    Plaintiffs seek recovery of all costs and reasonable attorneys' fees pursuant to the Florida Securities and Investor Protection Act.

**COUNT TWO:**
**UNTRUTH OR OMISSIONS UNDER**
**THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**

117.    Plaintiffs repeat, reallege and adopt paragraphs 1 through 106 above as if fully set forth herein.

118.    Plaintiffs each purchased CDs between December 2005 and December 2008, during which Pershing acted as the clearing broker.

119.    Pershing violated the Florida Securities and Investor Protection Act, Fla. Stat. section 517.301, by aiding SGC in the sale of unregistered securities by untruth or omission, with intent to deceive or defraud, or with reckless disregard for the truth or law, in violation of section 517.301 of the Florida Securities and Investor Protection Act.

120.    The CDs sold to the Plaintiffs are securities as defined by section 517.021(21) of the Florida Securities and Investor Protection Act.   The CDs were sold to the Plaintiffs in violation of section 517.07 of the Florida Securities and Investor Protection Act as they were not registered, and are not exempt from registration under the Florida Securities and Investor Protection Act.   The sale or offer of the CDs constitutes a violation of section 517.211 of the Florida Securities and Investor Protection Act.

121.    The CDs were offered and sold by means of untrue statements of material fact, or an omission of a material fact necessary to make the statements not misleading.   Thus, the offer

or sale constitutes a violation of section 517.301(3)(c) of the Florida Securities and Investor Protection Act.

122.    Pershing had general awareness of its role in the violations, rendered substantial assistance in the violations, and either intended to deceive the Plaintiffs, or acted with reckless disregard for the truth of the representations made by SGC.

123.    Pershing substantially assisted in the violations by failing to disclose information to the Plaintiffs or to government regulators.  Pershing had a duty to disclose that information to the Plaintiffs, and to the government regulators.

124.    Pershing's conduct satisfies section 517.211(2) of the Florida Securities and Investor Protection Act, which renders each person or agent making the sale jointly and severally liable.

125.    Pershing personally participated in and/or aided the sale of the CDs with knowledge that the offer was made with the use of untruths and materially misleading omissions. Pershing acted with the intent to perpetrate the sale of securities by SGC, or acted with reckless disregard for the truth or the law.

126.    The actions of Pershing have caused the Plaintiffs to sustain damages and losses. Pursuant to section 517.211(3)(a) of the Florida Securities and Investor Protection Act, Plaintiffs are entitled to recover the consideration they paid for the CDs, plus interest thereon, or actual damages together with interest thereon.

127.    Plaintiffs seek recovery of all costs and reasonable attorneys' fees pursuant to the Florida Securities and Investor Protection Act.

## DAMAGES

128.    Pursuant to section 517.211 of the Florida Securities and Investor Protection Act, Plaintiffs seek damages including but not limited to:

        a.    Rescission, including consideration paid for the CDs plus interest earned thereon from the date of payment;

        b.    Actual damages, including applicable interest;

        c.    Costs;

        d.    Attorneys' fees.

## JURY DEMAND

129.    Plaintiffs demand trial by jury.

## PRAYER

**WHEREFORE**, Plaintiffs pray the Defendant be summoned to answer this Complaint and that this case be tried before a jury and that upon final judgment, Plaintiffs recover their damages as alleged herein, including their actual damages, plus applicable interest, and their costs and expenses of suit, including reasonable attorneys' fees, and any and all other such relief this Honorable Court deem they may be justly entitled to.

Respectfully submitted,

Scott D. Hirsch, Esq.
Scarlett, Gucciardo & Hirsch, P.A.
25 Seabreeze Avenue, 3rd Floor
Delray Beach, FL 33483
Tel.:   561.278.6707
Facs.:  561.278.6244
shirsch@sghlawyers.com
Fla. Bar No. 0050833

Michael E. Criden, Esq.
Criden & Love, P.A.
7301 SW 57th Court, Ste. 515
South Miami, FL 33143
Tel.:    305.357.9000
Facs.:  305.357.9050
mcriden@cridenlove.com
Fla. Bar No. 714356